**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

CHRISTINA L. RANDEL,

                          Plaintiff,

        v.                                No. 5:14-CV-1449
                                                  (GLS/CFH)

CAROLYN W. COLVIN, Commissioner
of Social Security Administration,

                                Defendant.
_____

**APPEARANCES:**                         **OF COUNSEL:**

IACONIS LAW FIRM               CHRISTOPHER D. THORPE, ESQ.
501 Genesee Street
Chittenango, New York 13037
Attorneys for Plaintiff

Social Security Administration       FERGUS J. KAISER, ESQ.
Office of Regional General Counsel,
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER

      Plaintiff Christine L. Randel ("plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner" or "defendant") denying her applications for supplemental security

income benefits ("SSI") and Disability Insurance Benefits ("DIB"). Plaintiff moves for a

finding of disability, and the Commissioner cross moves for a judgment on the

pleadings. Dkt. Nos. 11, 16. For the following reasons, it is recommended that the

matter be remanded to the Commissioner.

# I. Background

Plaintiff, born on September 10, 1982, applied for Social Security Disability insurance benefits ("SSD") as well as Supplemental Security income benefits ("SSI") on October 14, 2011, alleging a disability onset date of September 15, 2006.[1] Those applications were denied on March 7, 2012. Dkt. No. 8-4 at 7 - 13.[2] Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held before ALJ Joseph L. Brinkley on January 24, 2013. Dkt. No. 8-2 at 23-38. Plaintiff's request for review was denied, making the ALJ's findings the final determination of the Commissioner. Id. at 16, 2-4. This action followed. Dkt. No. 1 ("Compl.").

## A. Facts[3]

### 1. Plaintiff's Hearing Testimony

Plaintiff is divorced and has three children. Dkt. No. 8-2 at 63, 69. Plaintiff graduated from high school and obtained an Associate's Degree. Id. at 54. Plaintiff provided that she was 5'4" tall and weighed approximately 230 pounds. Id. She had a valid driver's license, and occasionally drove her neighbor's car; she did not have her

---

[1] The onset date was amended at some point to be June 18, 2008. Dkt. No. 8-2 at 26.

[2] The undersigned's citations to the administrative transcript refer to the pagination generated by CM/ECF in the pages' header, not the pagination provided in the document.

[3] The following are not findings of fact of this Court, but are an iteration statements made by plaintiff or the vocational expert in order to provide a background for this case.

own car.  Id.  At the time of her hearing, plaintiff was living with her boyfriend.  Id. at 53.

Plaintiff reported that she has not worked since her alleged onset date of June 18,

2008.  Id. at 54-55.  Her last job involved babysitting in her home every day from 7:00

A.M. until 3:00 or 4:00 P.M.  Id. at 56.  Plaintiff took care of an eighteen-month-old

infant, and also cared for her own child at the same time.  Id.  at 57.  It appears that

plaintiff did not report income from this employment.  Id.  Plaintiff reported that she

stopped caring for the child because the mother of the child wanted to bring him to a

day care provided by her employer.  Id.  Prior to her babysitting job, plaintiff worked as

a substitute teacher or teacher's aide.  Id. at 58.  Her role involved changing diapers,

feeding, and playing with the children.  Id.  She had this job for a few months and it was

a full-time position.  Id. at 58-59.  She left this job because her "right knee started really

hurting" and when she reported that she could not come into work for a few days, "they

told [her] that they found somebody else to work."  Id. at 59.  Plaintiff's knee hurt her

when she had to sit on the ground with the children.  Id.  Her knee also hurt her during

her babysitting job, but "[she] needed income, so [she] figured [she]'d try it out to see[.]"

Id.

Plaintiff also worked for Denny's "for a short period of time as a cook and then

they slowly had [her] working down the line to prepping the food and having to make

like the pancake mixes and stuff[.]"  Dkt. No. 8-2 at 60.  These tasks "just killed [her]

arm and then [she] ended up getting tendinitis in [her] arm, so [she] didn't go back to

that job because it was hard and the pans were really heavy so it hurt [her] arms to hold

the pans and stuff, so that didn't work out."  Id.  In 2004, plaintiff worked at a Holiday

3

Inn hotel as a front desk clerk.  Id.  Plaintiff answered phones, checked guests in and out, and made reservations.  Id. at 61.  Plaintiff quit her job because her "supervisor wanted [her] to look him straight in the eye when [she] talked to him and [she] didn't like that very much so [she] told him [she] quit."  Id.  This was her sole reason for leaving that job.  Id.

Plaintiff also worked part-time at APAC Customer Services as a customer service representative.  Dkt. No. 8-2 at 61.  Plaintiff worked at night answering phones. Id.  Plaintiff also worked as a waitress, largely taking and delivering room service orders, at Vernon Country Suites.  Id. at 62.  She would answer phone orders and bring the meals to the guests' rooms.  Id.  Plaintiff briefly worked as a front desk clerk at a Ramada Inn motel, where she answered phones, made reservations, and "sometimes a little bit of housekeeping."  Id.  This was a full-time job, but plaintiff quit after her hours were cut to one day.  Id.  She worked one summer as a waitress at the restaurant Squat and Gobble.  Id.

Plaintiff did not look for work after she lost the babysitting job because she was pregnant, had just left her husband, moved in with her grandparents, and "had a lot of back pain and just pain all over."  Dkt. No. 8-2 at 63.  She felt that she "couldn't find a job that [she] would be able to do."  Id.  She had "pain in [her] arms and like [her] legs they burn a lot."  Id.  Plaintiff provided that she also felt that she could not work because her "memory like is really bad, so [she] feel[s] like [she] wouldn't be able to perform a job at all[.]"  Id.  at 63-64.

As of January 2009, plaintiff had arm, back, and knee pain, and had headaches.

Dkt. No. 8-2 at 64.  She stated that in 2009, and at the time of the hearing, she woke up with a headache every day.  Id.  It "hurts [her] eyes, behind [her] eyes.  They hurt all the time, and any loud noises really bothers [her], and [she] usually . . . put[s] . . . a cold pack on [her] head or something and try to just sit in a room that's quiet and dark . . . [I]t feels like my head is going to explode and there's like knives stabbing [her] in the head[.]"  Id.  The headaches lasted "hours and hours" and she has tried "several different migraine medications to see what would work for [her] and a lot of them didn't work, but now finally [she] found something that works."  Id. at 64.  Her migraines affected her ability to perform her babysitting and childcare roles, but she "just had to like push through trying to do it."  Id. at 65.  Her ex-husband was home during the day, so he would "help a little bit" with the child care.  Id.  Plaintiff described her level of pain from her headaches in 2009 as "[p]retty close to ten."  Id.  Plaintiff reported that her headaches are now more frequent, as she suffers from migraines "ten, twelve, eleven a month.  It's a lot."  Id.  Plaintiff estimated that she had migraines two to three times a month in 2009.  Id.  Plaintiff thought that stress brought on her migraines, and provided that she could not listen to loud music or she would get a migraine.  Id. at 66.

For her migraines, plaintiff has had CAT scans and X-rays performed, has taken many migraine medications, and received Botox injections.  Dkt. No. 8-2 at 66.  The Botox injections make plaintiff's headaches "a little better" but she still "wake[s] up with a headache every day and they're not as worse, but [she] still get[s] the migraines, especially when [she] cr[ies]."  Id. at 67.  Plaintiff has "a pill that [she] can take[,]" but she only has twelve per month, and she "find[s] that's not enough."  Id.  Plaintiff also

5

has Sumavel DosePro, which is "a shot you give yourself but its not a needle.  It's just like compressed air and the medicine gets injected in."  Id.  Plaintiff cannot take the Sumavel herself because it "scares [her] and it hurts really bad, and makes [her] bleed," but her boyfriend will administer it for her.  Id.  Plaintiff uses the shots a couple of times per month, and they bring her pain down to "about a four, three or four," and the relief lasts for "four or five hours," but if she gets upset or cries, "it just instantly boom, it's back there again."  Id. at 67-68.  The pills will lower the pain down to a level of four or five, but plaintiff tries to take just one pill to "spread them out over the month" because "you can only get max two a day[.]"  Id.  She will sometimes try to take a nap to get rid of her headaches, which "sometimes . . . works, sometimes it doesn't work."  Id.  Amerge works "better than anything [she has] ever tried before, and also the shot too."  Id.  It works within ten minutes.  Id.  Plaintiff does not take the shot as often as she would like because it hurts her.  Id. at 68-69.  The shot can be taken a maximum of twice per day.  Id.  Plaintiff testified that she would take Amerge every day if she were able to get more than twelve pills per month.  Id. at 69.

Plaintiff next discussed problems with her wrists and back, which started in 2006 or 2007.  Dkt. No. 8-2 at 69.  She reported that she has difficulty doing her daily activities because of arm pain that "goes all down [her] arm[.]"  Id.  The pain makes it difficult for plaintiff to care for her children.  Id.  She has pain in her back if she is carrying her children, vacuuming, or "that little bit of a hunch you've got to do to do the dishes."  Id. at 70.  When she has pain during doing dishes, she will walk away, then come back later and do the rest.  Id.

6

Plaintiff has knee pain stemming from a knee injury in high school.  Dkt. No. 8-2 at 70.  For her pain, she has had X-rays and MRIs of her knee and back, and attended physical therapy.  Id. at 70.  Plaintiff has arthritis in her right knee, which hurts when it is cold or when rains.  Id. at 71.  Plaintiff's MRI revealed two herniated discs and degenerative disc disease in her back.  Id.  Plaintiff attended physical therapy, which did not help and worsened her back pain.  Id.  She was told, the September before her hearing, that "the very last resort they would do is back surgery."  Id. at 72.  Plaintiff's back was worse at the time of the hearing than it was in 2008, but her knee pain "pretty much stayed consistent."  Id.  Plaintiff thinks her weight gain from her pregnancy and medications worsens her back pain.  Id. at 73.  She was told that if she lost weight, her knee and back would feel better, but exercise is painful for her, and she "do[esn]'t have a lot of money to eat right[.]"  Id.

Addressing plaintiff's alleged mental symptoms, plaintiff reported that she began to experience postpartum depression after her first son was born in 2002.  Dkt. No. 8-2 at 73.  She was treated with Zoloft, but her depression has worsened.  Id.  Plaintiff was hospitalized for two weeks at St. Joseph's Hospital after she experienced suicidal ideations.  Id.  Plaintiff provided that she continues to "get a lot of anxiety," and feels "hopeless, like nothing is going to get better."  Id. at 74.  Plaintiff has "had a lot of suicidal thoughts, but that's decreased quite a bit."  Id.  Plaintiff feels like she "d[oesn]'t care about anything.  It's hard to get up and do stuff because [she] just feel[s] like the world is going to end and [she doesn]'t want to do anything."  Id.  She experiences these feelings "[q]uite a bit."  Id.  Plaintiff cannot "really stay on a schedule of doing

7

things." Id.  It is difficult for her to "finish things that [she] start[s]." Id.  She "bounce[s] around doing stuff and tr[ies] to stay busy, but then [she] just d[oesn]'t want to . . . do anything." Id.

Plaintiff reported that her boyfriend takes care of the household. Dkt. No. 8-2 at 74.  He will cook, help plaintiff vacuum, "clean up a little bit sometimes, you know, not too much." Id.  Plaintiff will do the dishes and the laundry. Id.  She reported that the laundry is "a little bit heavy for [her] to carry going up and down the stairs because it's [the laundry] downstairs." Id. at 75.  Depending on the house chore, plaintiff will sometimes need to stop for a break. Id.  She will take breaks while vacuuming and doing the dishes. Id.  When it comes to cleaning, "it's just wiping stuff, it just hurts. It hurts [her] arm really bad." Id.

If plaintiff were "required to pick things up more than two or three times an hour," the most weight that she could pick up from floor level is ten pounds. Dkt. No. 8-2 at 76.  She "seldomly pick[s] up [her] son," who weighs thirty pounds, but "can't hold him for like only a couple minutes and that's it. So probably . . . [she] could pick up the 30 pounds but not for long, so it could probably be less pounds." Id.  She could not pick up thirty pounds repeatedly. Id.  Plaintiff reported that she can sit for twenty minutes to a half of an hour at a time before her back pain "becomes intrusive on [her] thoughts to where it interrupts what [she's] thinking about." Id. at 76.  She will have to "get up and walk around to try to get the kinks out or something." Id. at 76-77.  She can stand for ten to fifteen minutes before she "get[s] antsy" and her "knee will start to hurt from standing on it, so [she's] constantly up and down, or laying down feels good, so [she]

8

does a lot too." Id. at 77. Plaintiff spends a "couple hours" each day laying down "other than sleeping." Id.

Plaintiff experiences depression "every day, especially when [she] think[s] about her kids because they're not with [her]." Dkt. No. 8-2 at 77. They're not with her because "physically and mentally [she] just couldn't handle it." Id. The children lived with plaintiff's mother for a brief period, and now live with their father – her ex-husband. Id. Plaintiff sees the children every other weekend at her grandparents' house. Id. at 78. She "can't even take care of them because it hurts. [She] feel[s] like [she] d[oesn't] make the right decisions all the time. [She] feel[s] like [she] just can't be a good mother to them. [She] want[s] what's best for them." Id.

Addressing her bladder and urinary tract infections, plaintiff provided that she has a bladder "half the size of a normal person" and has a "bad kidney" or a "sponge kidney." Dkt. No. 8-2 at 79. Plaintiff suffers frequent urinary tract infections, so she takes medication to prevent them. Id. Plaintiff "get[s] kidney pain a lot. They tell [her] that [she's] passing like micro kidney stones when [she] get[s] that pain in [her] kidney. And [she] frequently ha[s] to go to the bathroom all the time." Id. On one occasion, plaintiff "tally marked" her bathroom usage; she discovered she used the restroom twenty-two times in one day. Id. Plaintiff cannot go to places, such as the park, where there is no restroom. Id.

### 2. **Vocational Expert Testimony**

The ALJ obtained testimony from Don Schader, a Vocational Expert ("VE"). Dkt.

No, 802 at 80.  The ALJ presented the following hypothetical: a person with the same age, education, vocational profile, and residual functional capacity as plaintiff, who could perform

> light work . . . but her ability to do a full range of this work is going to be limited or reduced by the following.  This claimant is limited to occasional lifting and carrying no more than 20 pounds at a time, but frequently lifting and carrying no more than ten pounds at a time . . . occasional bilateral overhead reaching, as well as occasional handling, fingering and feeling bilaterally with the upper extremities.  [O]ccasional operation of foot and leg controls with the lower right extremity, but . . . no such limitation with the other extremity, and this is the dominant extremity.  [O]ccasional climbing ramps and stairs, balancing, kneeling and stooping, to never crawl, crouch, or climbing ladders, ropes, or scaffolds.  She would need to avoid concentrated exposures to office sound environment.  Also she's to avoid constant exposure to bright lights, thus, she's limited to fluorescent type lighting, she's to avoid concentrated exposure to wetness, vibration, extreme hot or cold temperatures, and workplace hazards that would include . . . dangerous machinery and unprotected heights. [S]he's limited to simple, routine, repetitive tasks, and to jobs that does [sic] not require production quotas or assembly line.  Lastly, she must have unimpeded access to the bathroom during scheduled breaks.

Id. at 83.   The VE determined that someone with the above RFC could perform the work of hotel clerk as past work, and that the work of a room service waitress would be "possible."  Id. at 84.  The VE stated that those jobs could be performed "per DOT and as she said she'd done them in the past[.]"  Id.  The VE would preclude the customer service past work for a claimant with the RFC in the first hypothetical because the job was sedentary.  Id.

The ALJ presented a second hypothetical which "will be like hypothetical number

one . . . but with the following." Dkt. No. 8-2 at 84-85. The hypothetical claimant would need "a sit/stand at will option," and would be limited to occasional reaching in all directions. Id. at 85. The VE

> couldn't guarantee a sit/stand option if the person needed to
> do that just because as the desk clerk there would probably
> be times the person could sit if they needed to. . . there's a
> lot that goes into that. If you have a shift that you're working,
> if you're doing the overnight it's probably less busy than . . .
> in the afternoon.

Id. The VE confirmed that the sit/stand option could not be done at will in the desk clerk position. Id. When the ALJ asked whether the claimant in hypothetical two could perform jobs in the regional or national economy, the VE replied that "it's not addressed in the DOT, so . . . if I give an opinion, this is going to be based on my experience primarily[.]" Id. at 86. The VE provided that, the claimant in hypothetical two could perform the jobs of (1) mail room clerk, strength light, SVP of 2, with 115,010 jobs in the national economy, and 180 jobs in the regional economy; and (2) office helper, light strength, SVP 2, with 2,789,590 jobs in the national economy, and 5,950 in the local region. Id. at 86-87. When asked whether his testimony was consistent with the DOT, the VE provided, "except for the sit/stand option part, but the rest of it would be consistent." Id. The VE explained that the sit/stand option is based on the VE's "experience with people that are doing that type of work," or his personal experience of observing how people do those jobs. Id.

For a third hypothetical, the ALJ presented a claimant with the same RFC as claimant in the second hypothetical, but with the additional limitation of unlimited restroom breaks. Dkt. No. 8-2 at 87-88. The VE provided that there would not be jobs

in the national or regional economy to accommodate that addition to the RFC.  Id. at 88.

He explained that "if it's an every day thing I think that could potentially be a problem."

Id.

Upon cross-examination from plaintiff's counsel, the VE readdressed

hypothetical one, and testified that a person who could perform only occasional

handling may not be able to do the job of desk clerk.  Dkt. No. 8-2 at 89.  He also

provided that, in the room service clerk role, "using their hands for only occasional

handling, fingering and feeling would preclude that."  Id.  The VE explained that

> as the DOT describes that job I think that . . . hypothetical
> person could do that.  If you look at the way it's probably
> realistically done, my assumption would be that there's other
> – if that's what the person's job is, they're not going to sit
> there – let them sit from midnight to 3:00 in the morning
> without doing anything waiting for a room service order to
> come in.

Id. at 91.  Thus, the VE confirmed that "per the DOT they [the claimant in hypothetical

one] can do it [the role of room service clerk and desk clerk], but as [he] observed it

being done that [he] h[as] concerns as to whether or not it could be done that way."  Id.

The VE concluded that, "in [his] experience [he] feel[s] that those jobs [mail clerk] could

be done by that hypothetical person that you mentioned."  Id.  The VE did provide that

fingering and feeling in the mail clerk role would "most likely" be "more frequent than

occasional," and that such conclusion was "based on [his] experience, but not the

DOT[.]"  Id. at 94.

Addressing the office helper job, the VE provided that the use of hands for

fingering and feeling would be "more frequent than occasional realistically[,} but

12

provided that "that would be the case for most jobs. There aren't . . . too many jobs that you don't use your hands for. So if somebody can't use either hand, there's not a lot of work to go back to." Dkt. No. 8-2 at 94-95. The VE concluded that, accepting the RFC in hypothetical one, and adding a limitation of two to three non-scheduled breaks lasting a half of an hour or more during the normal work day each day, would be result in no jobs for such hypothetical claimant. Id. at 96.

Next, the VE was presented with the same RFC as set forth in hypothetical one, but with a marked limitation

> regarding maintaining attendance, being punctual within customary strict standards and tolerances, and completing a normal workday without interruptions from psychologically-based symptoms, and performing at a consistent pace without an unreasonable number of and length of rest periods, responding appropriately to changes in the workplace, and dealing with normal work stress.

Dkt. No. 8-2 at 96-97. The VE testified that such a person would not be able to perform her past relevant work. Id. at 97. He further testified that there would be no jobs that such a person could perform. Id.

B. **Medical Reports**

1. **Plaintiff's Medical Providers**

a. **Minhaj Siddiqi, M.D., Psychiatry**

Minhaj Siddiqi, M.D. completed a mental impairment questionnaire on January 9, 2013. Dkt. No. 8-9 at 116. Dr. Siddiqi noted that plaintiff "typically attends bi-weekly appointments for 45-50 minutes." Id. Dr. Siddiqi noted plaintiff's current and highest

GAF[4] for the past year to be 58.  Id.  Dr. Siddiqi provides plaintiff with "[i]ndividual verbal

therapy and psychiatry services for medication management."  Id.  Dr. Siddiqi stated

that plaintiff takes Zoloft, Wellbutrin, and Ambien.  Id.  During examination, plaintiff's

was neatly groomed and her appearance was "appropriate"; her mood was dysphoric,

anxious; her affect was congruent with mood; her thought content was reality based;

her speech normal; her insight fair; and her judgment and thought processes in tact.  Id.

Dr. Siddiqi's prognosis for plaintiff was fair.  Id.  Dr. Siddiqi noted the following

symptoms: anhedonia or pervasive loss of interest in almost all activities; decreased

energy; thoughts of suicide; feelings of guilt or worthlessness; impairment in impulse

control; generalized persistent anxiety, mood disturbance, difficulty thinking or

concentrating, emotional withdrawal or isolation, intense and unstable interpersonal

relationships and impulsive and damaging behavior, easy distractibility, memory

impairment (short), and sleep disturbance.  Id. at 117.

Dr. Siddiqi provided that plaintiff had (1) an unlimited or very good ability to: get

along with coworkers or peers without unduly distracting them or exhibiting behavioral

extremes and to be aware of normal hazards and take appropriate precautions;

(2) limited but satisfactory ability to: understand and remember very short and simple

---

4  The GAF scale "ranks psychological, social, and occupational functioning on a hypothetical
continuum of mental health-illness."  Pollard v. Halter, 377 F.3d 183, 186 n.1 (2d Cir. 2004). A GAF
between forty-one and fifty signals "'[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals,
frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no
friends, unable to keep a job).'"  Zabala v. Astrue, 595 F.3d. 402, 406 n.2 (2d Cir. 2010) (quoting
Diagnostic and Statistical Manual of Mental Disorders ("DSM") 34 (4th ed., Text Rev. 2000)).  A GAF "in
the range of 51 to 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few
friends, conflicts with peers or co-workers.'").  Id. at 406 n.3 (quoting DSM-IV at 34).

instructions, carry out very short and simple instructions, maintain an ordinary routine without special supervision, make simple work-related decisions, and ask simple questions or request assistance; (3) seriously limited but not precluded in her ability to: remember work-like procedures, maintain attention for two-hour segments, work in combination with or in proximity to others without being unusually distracted, and accept instructions and respond appropriately to criticism from supervisors; (4) unable to meet competitive standards in her ability to: maintain regular attendance and be punctual within customary, strict tolerances; complete a normal work day and workweek without interruption from psychologically-based symptoms; and respond appropriately to changes in a routine work setting.  Dkt. No. 8-9 at 118.  Dr. Siddiqi provided that plaintiff "has difficulty concentrating and focusing therefore hindering her ability to maintain attention."  Id.  Plaintiff's "symptoms of anxiety and depression increase under pressure and [plaintiff] also has trouble maintaining a daily schedule and following through with activities due to her mental health concerns."  Id.  Plaintiff has "poor interpersonal relationships with others at times and struggles with managing her symptoms of depression, anxiety, impulsivity and irritability."  Id.  Plaintiff "is able to interact appropriately with others[.]  She experiences some anxiety but does not appear to exhibit behavioral extremes."  Id.

Dr. Siddiqi performed provided an MSS stating that plaintiff was unlimited or very good in her ability to interact appropriately with the general public, maintain socially-appropriate behavior, and adhere to basic standards of neatness and cleanliness.  Dkt. No. 8-9 at 119.  Plaintiff was limited but satisfactory in her ability to use public

15

transportation.  Id.  Plaintiff was seriously limited but not precluded in her abilities to carry out detailed instructions and travel in an unfamiliar place.  Id.  Dr. Siddiqi concluded that plaintiff was unable to meet competitive standards when it came to understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with the stress of semiskilled and skilled work.  Id.  Dr. Siddiqi opined that plaintiff's "anxiety may prohibit her from traveling in unfamiliar places.  She appear [sic] to interact appropriately with others and always presents as appropriately groomed."  Id.  Dr. Siddiqi provided that plaintiff does not have low IQ or reduced intellectual functioning. Id.  Addressing plaintiff's functional limitations, Dr. Siddiqi provided that plaintiff has marked restriction of activities of daily living; moderate difficulties in maintaining social functioning; marked deficiencies of concentration, persistence, or pace; and one or two repeated episodes of decompensation of at least two weeks in duration within the past twelve months.  Id. at 120.  Dr. Siddiqi predicted that plaintiff's impairments would cause her to miss more than four days of work per month and that plaintiff's impairment will last at least twelve months.  Id.

b. **G. Mohiuddin, M.D., Psychiatry**

Plaintiff treated with Dr. Mohiuddin at the Neighborhood Center Behavioral Health beginning in 2010.  Dkt. No. 8-7 at 36.  Plaintiff reported that she "doesn't want to live because of her many medical problems, such as thyroid, knee pain, diverticulosis, fibromyalgia, migraine headaches, frequent UTIs, GERD, chronic

sinusitis, and a small bladder." Id. at 38. Plaintiff reported difficulty with "comprehension, numbers and memory," noting that she "'can't help her son with his math and he's in second grade.'" Id. Plaintiff reported her substance abuse, current and past. Id. at 42-43. On intake, the following were reported to be within normal limits: appearance, eye contact, thought content, orientation, and insight, and plaintiff engaged in cooperative behavior. Id. at 44-45. Plaintiff reported experiencing passive suicidal thoughts, and stated that her though process was "racing." Id. at 45. She further reported a short attention span, impaired concentration, and impaired calculation ability. Id. When asked of her life goals, plaintiff responded that she did not have any. Id. Plaintiff was tearful. Id. at 46. She was "stressed with divorcing her husband and raising her three children." Id. Plaintiff reported that she has had "fleeting thoughts of harming her children at times[,]" including a thought to throw her eleven-month-old child into her pool. Id. She further reported "seeing shadows at times." Id. Upon intake, Dr. Mohiddin's prognosis was "[g]uarded. However, with services provided by this clinic the patient may be able to function better and will be able to meet her goals." Id. at 50. At a visit on October 12, 2010, plaintiff reported smoking marijuana every day. Id. at 54. When asked if she would like to be referred for a substance use evaluation, plaintiff reported that she "is not ready to go for any substance evaluation program or substance rehab." Id.

### c. Kimberly Centore, LCSW - Therapist

On January 23, 2013, Kimberly Centore, LCSW, completed a statement

17

regarding her treatment of plaintiff.  Dkt. No. 8-6 at 146.  Ms. Centore reported that

plaintiff "experiences many symptoms of depression including poor concentration,

appetite disturbance, indecision, loss of interest and feelings of helplessness and

hopelessness."  Id.  Plaintiff "also reports experiencing symptoms of anxiety in social

situations and states that her heart races and she feels dizzy or lightheaded."  Id.

Plaintiff "often engages in impulsive behaviors, has suicidal ideation and has previously

attempted suicide due to an increase in her symptoms of depression."  Id.[5]


### d. **Dr. Oleg Dulkin - Primary Care**

Dr. Dulkin completed a physical medical report on December 27, 2012.  Dkt. No.

8-9 at 107.  Dr. Dulkin provided that he has been treating plaintiff since 2006, and sees

her every three to six months and "prn." Id.  Dr. Dulkin provided that there was not

anything "in the patient's previous medical history [that] relates to the patient's present

conditions[.]"  Id.  To the extent legible,[6] Dr. Dulkin's clinical findings were: "depressed,

anxious."  Id.  He diagnosed plaintiff with depression and anxiety at a severity of eight

out of ten, with an onset date of 2006.  Id.  Dr. Dulkin provided that the depression and

anxiety caused functional restrictions.  Id.  Dr. Dulkin also diagnosed fibromyalgia at a

severity of nine out of ten, with an onset date of 2006.  Id.  He also reported that

---

[5]  In a treatment note from April 25, 2012, Ms. Centore noted that plaintiff was offered
employment, but was unable take the offer as she is in need of her own vehicle.  Dkt. No. 8-9 at 151.

[6]  Dr. Dulkin's report is handwritten and portions are difficult to discern.

plaintiff's fibromyalgia caused functional restrictions.[7] The activities that would most likely aggravate plaintiff's conditions were reported to be "[p]oor relationship at work, physical work." Id. at 108. Dr. Dulkin reported that, on average, plaintiff would be absent more than three times per month. Id. Dr. Dulkin's prognosis was guarded. Id. He expected plaintiff's impairments to last at least twelve (12) months. Id. at 109.

Dr. Dulkin provided that he "do[es] not think she [plaintiff] is able to work at this point." Dkt. No. 8-9 at 109. Plaintiff's impairments, according to Dr. Dulkin, are likely to produce good and bad days. Id. Plaintiff's ability to lift and carry is affected by the impairment. Id. at 110. Plaintiff can frequently lift less than ten pounds, occasionally lift ten to twenty pounds, and never lift fifty or more pounds. Id. Dr. Dulkin also provided that sitting, standing, and walking are affected by plaintiff's impairment. Id. Dr. Dulkin opined that plaintiff could walk for one block without rest, sit for thirty minutes continuously, stand for fifteen minutes continuously, and could sit/stand/walk for a total of four hours in an eight-hour work day. Id. Plaintiff needs: "periods of walking around" during an eight-hour work day; a job which permits shifting positions at will from sitting, standing, or walking; and the ability to take unscheduled breaks during an eight-hour work day, approximately three times per day, for thirty minutes each before returning to work. Id. at 111. Pushing and pulling is affected by plaintiff's impairment. Id. Dr. Dulkin reported that plaintiff is limited in her upper extremities due to fibromyalgia, and

---

[7] The report lists a third "medical problem", with a severity of six to seven with an onset of 2006, however, that medical problem is illegible. Dkt. No. 8-9 at 107.

in her lower extremities due to "DDD,[8] herniated discs." Id. Dr. Dulkin reported that an MRI showing findings of herniated discs formed the basis of his conclusions for plaintiff's limitations in sitting, standing, walking, pushing, and pulling. Id.

Dr. Dulkin provided that plaintiff could occasionally climb, balance, and bend and twist at the waist; and could frequently kneel, crouch, crawl, and stoop. Dkt. No. 8-9 at 112. Dr. Dulkin reported that plaintiff had no limits to reaching in all directions, handling, fingering, and feeling. Id. Further, Dr. Dulkin provided that the following environmental factors adversely influenced plaintiff's impairments, whether she were working inside or outside: temperature extremes, dust, vibration, humidity, wetness, hazards, fumes, odors, chemicals, and gases. Id. at 113. He also provided that plaintiff has "chronic sinus problems" and that "[illegible] and extreme temperatures can make it worse." Id. Due to plaintiff's back problems, Dr. Dulkin suggested that "[h]azards should be carefully watched." Id. Dr. Dulkin identified the following locations of pain for plaintiff: bilateral lumbrosacral spine, both shoulders, both arms, both hands and fingers on each hand, bilateral hips, both legs, and bilateral knee/ankle/feet pain. Id. at 114. Dr. Dulkin attributed the pain to plaintiff's fibromyalgia and lumbrosacral spine herniated discs. Id. The following factors precipitate pain: changing weather, movement/overuse, cold, fatigue, static position, and stress. Id. Dr. Dulkin reported that emotional factors contribute to the severity of plaintiff's symptoms and functional limitations. Id. Plaintiff frequently experiences symptoms severe enough to interfere with attention and

_____

[8] It is the undersigned's understanding that "DDD" stands for degenerative disc disease. Dkt. No. 8-9 at 111.

concentration.  Id.  Dr. Dulkin reported plaintiff to have a marked limitation in the ability to deal with work stress.  Id.

### e. **Martin Morell, M.D. - Rheumatology**

Martin Morell, M.D., Board Certified Rheumatologist, completed a physical medical report on January 23, 2013.  Plaintiff complained to Dr. Morell of "on-going joint pain since teenage years – physical exam at [illegible] did not find classic tender points for arthritis dx."  Dkt. No. 8-9 at 181.  Plaintiff's subjective complaints were pain in her arms, both knees, and lumbar spine pain.  Id.  Dr. Morell noted that X-rays of plaintiff's lumbar spine dated April 7, 2011 showed "minimal degenerative disease all other testing & xrays are in normal range."  Id.  Dr. Morell's treatment involved "medication monitoring treat symptomatically, referred for P.T."  Id. at 182.  Dr. Morell prescribed multiple medications to plaintiff for her symptoms.  Id.  Dr. Morell's prognosis was "chronic conditions."  Id.  Dr. Morell expected that the conditions would last at least twelve months.  Id.  Dr. Morell could not assess whether plaintiff could perform her former jobs or similar work or whether activities would aggravate plaintiff's conditions "without functional capacity evaluation completed."  Id. at 182-83.  Dr. Morell opined that plaintiff's conditions were likely to produce good days and bad days.  Id. at 182.

### f. **Dr. Ahmed Shatla -Neurology**

Dr. Shatla performed a neurological consultation of plaintiff on December 5, 2012.  Dkt. No. 8-9 at 53.  Plaintiff reported intractable migraine headaches that "come

like 20 times a month." Id. Plaintiff denied, among other things, psychiatric and musculoskeletal symptoms. Id. Plaintiff's "[m]ood, effect and thought content" were "normal" during the exam. Id. at 54. Plaintiff's "[o]cular mobility are all intact in all directions of gaze without nystagmus." Id. Plaintiff had no "visual field cuts" and "[n]o evidences of INO or relative afferent pupillary defects." Id. "Sciara is clear without injection. Fundl looks benign without papilledma or split hemorrhage, or pigmentary deposits. Cranial nerves are all intact." Id. For plaintiff's motor examination, she had "[g]ood bulk and tone. Strength is 5/5 in medical research Council scale. No abnormal movements no rigidity or spasticity." Id. Plaintiff's sensory examination was "intact as to all modalities[.]" Id. Her cerebellar function "are all intact including, finger-to-nose testing heel-to-shin testing dysdiadochokinesia without rebound." Id. Plaintiff's gait was "steady, with normal posture reflex, walking and tandem, heel to toes is normal, negative Romberg." Id. Dr. Shatla noted that plaintiff's migraines have "been refractory to medications and the patient is getting many kinds of medications," but recommended that plaintiff "continue with the same medications for now however, I will order 200 units of Botox to be given to her as quickly as possible to prevent her headaches." Id.

Dr. Shatla also performed a neurological examination on October 19, 2012. Dr. Shatla reported plaintiff's migraines as stable and noted she was "doing very well" and experiencing "one or two/month." Dkt. No. 8-9 at 51. Before that visit, Dr. Shatla also performed a neurological examination of plaintiff on November 16, 2011. Dkt. No. 8-9 at 49. Plaintiff reported bilateral eye pain and sensitivity to light. Id. An ophthalmologist told her she had "no eye condition." Id. Amerge helps plaintiff's pain,

22

but "she is running out of rx quickly." Id. The neurologist recommended to "keep current rx," and noted that use of Botox was discussed, but that plaintiff "does not want injections at this time." Id. at 50. At a June 19, 2012 visit, plaintiff's condition was reported as "stable" and plaintiff was noted to be "[d]oing very well" with "one or 2/month." Id. at 51.

### g. Marshall E. Pedersen, M.D., Neurology

Dr. Pedersen performed a neurological exam on September 12, 2011. Dkt. No. 8-8 at 204. Plaintiff's cervical spine was "nontender and has adequate range of motion." Id. at 206. Her muscle strength was five out of five "throughout the upper and lower extremities with intact light touch sensation." Id. Plaintiff's deep tendon reflexes were two out of four and equal throughout the upper and lower limbs. Id. Plaintiff's "[s]traight leg raising is negative 80 degrees bilaterally." Id. "Manipulation of the right hip was associated with increased right-sided low back pain." Id. Plaintiff was able to rise from sitting "rather easily, being able to stand fully erect. Id. Plaintiff's gait was "stable," and she could perform "heel and toe walk without difficulty." Id. Plaintiff's lumbar spine "appear[ed] slightly hyperlordotic." Id. There was "tenderness to palpitation in the region of SI joints, right greater than left." Id. There was "mild lidline lumbrosacral junction tenderness as well." Id. Plaintiff's "Sciatic notches are nontender." Id. There was greater right trochanteric tenderness than left. Id. Plaintiff's "[r]ange of motion at the lumbar spine appears only minimally restricted on extension 10-15 degrees with stated right-sided low back pain at that extreme." Id.

23

Dr. Pedersen's review of a July 20, 2011 lumbar spine MRI revealed

> evidence of degenerative disk disease, primarily at L5/S1 and to a lesser extent at L4/5. There is a small left L4/5 foraminal and far lateral disk bulge without significant neural compression. Broad base disk bulging primarily towards the right at L5/S1 once again does not appear to cause any significant neural compression. No other significant abnormalities are evident.

Id. Dr. Pedersen noted that his "study is somewhat limited, as there are only axial slices of L4/L5 and L5/S1." Id. Dr. Pedersen's assessment of plaintiff was as follows: "[d]egenerative disc disease L5-S1 > L45 with small LEFT L45 foraminal disc bulge." Id. at 207. His plan was "[p]hysical therapy for 6-8 weeks; weight reduction program; if no significant improvement, refer to Bassett Pain Center for consideration of aggressive conservative therapy; failing that return to neurosurgical clinic." Id.

### 2. Consultative Examiners

#### a. Robi Rosenfeld, D.O. - Physical

Robi Rosenfeld, D.O. performed an internal medicine examination of plaintiff on January 23, 2012. Dkt. No. 8-8 at 272. Plaintiff reported right knee pain at a level of seven out of ten; low back pain at a level of seven out of ten; fibromyalgia at a level of two out of ten, with no radiation; Hashimoto's thyroiditis, treated with medication; and migraines, occurring twice per month, lasting for twenty minutes, with no nausea, vomiting, or aura, that are immediately resolved if medication is taken early. Id. Plaintiff's current medications, as relevant here, included: Flexeril for back tightness; Levoxyl for Hashimoto's thyroiditis; Norco for pain relief; Remeron for anxiety; Abilify

Vistaril for anxiety; Cymbalta for mental health; Lyrica for fibromyalgia; Mobic for arthritis; Libroderm for back pain; Macrobid for "chronic UTIs due to small bladder"; Vesicare "for frequent urination due to small bladder"; Verapamil for migraines; Emerge for migraines, and Sumavel, a shot for migraines. Id. at 273.

Plaintiff reported doing cooking, cleaning, laundry, shopping, showering and dressing. Dkt No. 8-8 at 273. Her hobbies were watching television and listening to the radio. Id. Plaintiff was 5'4" and weighed 219 pounds. Id. Plaintiff appeared to be in no acute distress, had normal gait, could walk on heels and toes without difficulty, had a normal stance, and could perform a full squat. Id. She used no assistive devices, needed no help getting on and off of the exam table, and could rise from her chair without difficulty. Id. at 274. Plaintiff's cervical spine

> show[ed] full flexion bilaterally, and full rotary movement bilaterally. No scoliosis, kyphosis, or abnormality in thoracic spine. Lumbar spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. SLR negative bilaterally. Full ROM of shoulders, elbows, forearms, and wrists bilaterally. Full ROM of hips, knees, and ankles bilaterally. No evident sublaxations, contractures, ankylosis, or thickening. Joints stable and nontender. No redness, heat, swelling, or effusion. There was no trigger points found for fibromyalgia.

Id. at 275. Plaintiff's "DTRs physiologic and equal in upper and lower extremities. No sensory deficit noted. Strength 5/5 in the upper and lower extremities." Id. Plaintiff's hand and finger dexterity were in tact. Grip strength 5/5 bilaterally. Id. Dr. Rosenfeld diagnosed chronic low back pain, right knee pain, and fibromyalgia. Id. Dr. Rosenfeld reported plaintiff's prognosis as fair. Id. As for her medical source statement, Dr. Rosenfeld reported "no physical restrictions found." Id.

b. **Michael Alexander, Ph.D** - **Psychiatric**

Michael Alexander, Ph.D performed a psychiatric consultative examination of plaintiff on February 2, 2012. Dkt. No. 8-2 at 279. Plaintiff reported that she stopped working in December 2008 because of her fibromyalgia. Id. Plaintiff was hospitalized in 2010 and 2011 for depressed mood. Id. She has seen mental health professionals for the past two years, and has been seeing her current psychiatrist and therapist on a regular basis outpatient basis since August 2011. Id. Plaintiff reported difficulty falling asleep and increased appetite. Id. She reported "a history of dysphoric mood, decreased motivation to engage in tasks, irritability intermittent feelings of hopelessness, without suicidal intent, and tendency to apprehension and worry since 2002." Id. Plaintiff "does not endorse further symptoms of depression and denies suicidal and homicidal ideation." Id. Plaintiff also reports "a longstanding history of impulsive behavior, for example overspending or being sexually promiscuous." Id. at 279-80. There was no evidence of panic, manic-related symptoms, or thought disorder. Id. at 280. The medication plaintiff's psychiatrist provides "for these symptoms does help reduce their intensity somewhat." Id. Plaintiff reported a history of frequent or occasional use of alcohol, cannabis, cocaine, acid, and ecstacy since high school. Id. Plaintiff reported last using acid and ecstacy in school, and use of alcohol, cannabis, and cocaine five years ago. Id. Plaintiff reported no drug and alcohol treatment, and that she stopped use on her own. Id.

During examination, plaintiff "presented as a cooperative, friendly, and alert female. Her manner of relating and social skills were adequate." Dkt. No. 8-8 at 280.

Plaintiff was well groomed; her gait, posture, and motor behavior were normal; and her eye contact appropriate.  Id.  Her "[e]xpressive and receptive language was adequate for normal conversation."  Id.  Her thought processes were "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the examination."  Id.  Her affect was "[o]f full range and appropriate in speech and thought content."  Id.  Plaintiff's mood was neutral; her sensorium was clear; she was oriented x3; her attention and concentration was intact, as she could count, perform simple calculations and serial 3s.  Id. at 281.  Plaintiff's memory skills were intact: she identified three out of three objects immediately and two out of three objects after five minutes.  Id.  She could perform six digits forward and three digits back.  Id.  Plaintiff's cognitive functioning was average and her insight and judgment were good.  Id.

Dr. Alexander reported that plaintiff could dress, bathe, groom herself, cook, clean, shop, manage money, and take buses independently.  Dkt. No. 8-8 at 281.  Plaintiff does not have close friends, but is close to her boyfriend, mother, and grandmother.  Id.  She spends her time at home, watches TV, but does little else.  Id.  Dr. Alexander's medical source statement provided that plaintiff could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and can appropriately deal with stress.  Id.  Dr. Alexander concluded that the results of the examination "appear to be consistent with both psychiatric as well as substance abuse problems which in themselves do not significantly interfere with the claimant's ability to

function on a daily basis." Id. Dr. Alexander provided a fair prognosis for plaintiff. Id. at 282.

### c. **H. Tzetzo, Non-Examining Medical Consultant**

H. Tzetzo, Psychiatry performed a psychiatric review technique on February 7, 2012. Dkt. No. 8-9 at 5. Teztzo provided that plaintiff has the following medically determinable impairment – major depressive disorder, impulse control disorder, cannabis abuse – and that symptoms, signs, and laboratory findings substantiate the presence of such impairment. Id. at 5, 9-10. Reviewing the "B" criteria of the listings; Tzetzo determined that plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; one or two repeated episodes of deterioration, each of extended duration. Id. at 12. Evidence did not establish the presence of "C" criteria. Id. at 13. Tzetzo concluded that plaintiff "should be able to understand and follow work directions in a work setting (with low public contact), maintain attention for such tasks, relate adequately to a work supervisor for such work tasks, and use judgement [sic] to make work related decisions in a work setting (with low public contact now, in my opinion." Id. at 14.

In a Mental Residual Functional Capacity Assessment, also dated February 7, 2012, H. Tzetzo concluded that plaintiff was not significantly limited in her: ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out very

short and simple instructions, carry out detailed instructions, ability to make simple work-related decisions, ask simple questions or request assistance, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation. Dkt. No. 8-9 at 16. Tzetzo concluded that plaintiff was moderately limited in her: ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to maintain socially-appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; set realistic goals or make plans independently of others. Id.

### d. **Mary McLaron, M.D.**

In a "case analysis" performed on April 26, 2012, Mary McLarnon, M.D., from NEPSC New York,[9] provided: "File reviewed[.] The prior determination is affirmed as

---

[9] It appears that NEPSC New York stands for the Northeastern Program Service Center, a Social Security Processing Center in Jamaica, Queens. See Social Security Administration Website https://www.socialsecurity.gov/ny/services-nepsc.htm (last visited Mar. 1, 2016).

written." Dkt. No. 8-9 at 35.

## II. **Discussion**

### A. **Standard of Review**

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). If supported by substantial evidence, the Commissioner's finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

B.  **Determination of Disability**[10]

"Every individual who is under a disability shall be entitled to a disability . . .

benefit . . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment . . . which has lasted or can be expected to last for a

continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically-

determinable impairment is an affliction that is so severe that it renders an individual

unable to continue with his or her previous work or any other employment that may be

available to him or her based upon age, education, and work experience.  Id. §

423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical

and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the

impairment is "based [upon] objective medical facts, diagnoses or medical opinions

inferable from [the] facts, subjective complaints of pain or disability, and educational

background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018 (NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

First, the [Commissioner] considers whether the claimant is

---

[10]  Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  Donato v. Sec 'y of Health and Human Services, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

currently engaged in substantial gainful activity.

If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  DeChirico v. Callahan,134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court

cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 U.S.C. § 405(g), as amended; Halloran, 362 F.3d at 31.  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  The Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review."  Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

## C.  **ALJ Determination**

Applying the five-step disability sequential evaluation, the ALJ determined that plaintiff met the insured status requirements of the Social Security Act through June 30, 2008, and has not engaged in substantial gainful activity since June 18, 2008, the alleged onset date.  Dkt. No. 8-2 at 28.  The ALJ determined that plaintiff has the following severe impairments: fibromyalgia, degenerative disc disease with disc bulge,

right knee pain, migraine headaches, urinary tract infections, pyelonephritis[11], GERD,[12]

sinusitis, hypothyroidism, obesity, depressive disorder, personality disorder, impulse

control disorder, and history of poly-substance abuse.  Id. at 29.  At step three, the ALJ

determined that plaintiff did not have an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments.  Id. at 29.

Before reaching step four, the ALJ concluded that plaintiff has the residual functional

capacity ("RFC")

> to perform light work, as defined in 20 C.F.R. 404.1567(b)
> and 416.967(b), except that the claimant: can occasionally
> reach in all directions, handle, finger, and feel with the
> bilateral upper extremities; can occasionally operate foot
> and leg controls, with the right lower dominant extremity; can
> occasionally climb ramps/stairs, balance, kneel, stoop; can
> never crawl, crouch, or climb ladders, ropes, or scaffolds;
> must avoid concentrated exposure to loud noises (limited to
> office sound environment), bright lights (limited to
> fluorescent light), wetness, vibrations, extreme hot or cold
> temperatures, and workplace hazards including unprotected
> heights, dangerous machinery, and uneven terrain; is limited
> to simple, routine, repetitive tasks and cannot perform work
> that requires production quotas and assembly lines.  In
> addition, the claimant needs unimpeded access to a
> bathroom during regularly scheduled breaks, and a sit/stand
> at will option.

Id. at 31.  At step four, the ALJ noted that, pursuant to 20 C.F.R. §§ 404.1565 and

---

[11] Although parties, and the ALJ at page 29 of his determination, refer to "polynephritis," it appears clear that the parties intend to refer to pyelonephritis.  Pyelonephritis is a "bacterial infection of the kidney parenchyma."  The Merck Manual 2374 (19th ed. 2011).

[12]  Gastroesophageal Reflex Disease, or GERD: "[i]ncompetence of the lower esophageal sphincter allows reflex of gastric contents into the esophagus, causing burning pain."  The Merck Manual 125 (19th ed. 2011).

416.965, plaintiff is unable to perform any past relevant work, and that transferability of job skills was "not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that claimant is 'not disabled,' whether or not the claimant has transferable job skills." Id. at 36-37. Next, the ALJ determined that, given plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform," including the positions of mailroom clerk and office helper. Id. at 37. Finally, the ALJ concluded that plaintiff has not been under a disability as defined in the Social Security Act. Id. at 38.

### D. **Analysis**

Plaintiff contends that the ALJ failed to: (1) accord proper weight to her treating providers, Dr. Siddiqi, Ms. Centore, and Dr. Dulkin; (2) appropriately consider the effects of plaintiff's pyelonephritis, overactive bladder, frequent urinary tract infections, personality disorder, impulse control disorder, and right knee pain; and (3) apply the factors of Social Security Ruling ("SSR") 96-7p in assessing her credibility. See generally Compl.

### 1. **Treating Physician Rule**

Under the "treating physician's rule," the ALJ must give "controlling weight" to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). Although the treating physician rule need not be applied if the treating physician's opinion is inconsistent with opinions or other medical records, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). Even when the treating physician's opinion is not given controlling weight, an ALJ "must consider various 'factors' to determine how much weight to give to the opinion[,]" including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors . . . . " Hallorhan, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2). The ALJ is also required to set forth her reasons for the weight she assigns to the treating physician's opinion. Id. The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; Brogan-Dawley v. Astrue, 484 F. App'x 632, 633 (2d Cir. 2012). However, "where the evidence of record permits [the court] to glean the rationale of an ALJ's decision," the ALJ need not "have mentioned every item of testimony presented to him [or her] or have explained why he [or she] considered particular evidence unpersuasive

or insufficient to lead him [or her] to a conclusion of disability." Petrie v. Astrue, 412 F. Appx. 401, 407 (2d Cir. 2011).

In addition, a consultative physician's opinions should generally be given "little weight." Giddings v. Astrue, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and citation omitted). This is because consultative examinations "are often brief, are generally performed without benefit or review of [the] claimant's medical history, and, at best, only give a glimpse of the claimant on a single day." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) (internal quotation and citation omitted). However, a consultative examiner's opinion can be considered substantial evidence where it is well supported by medical evidence in the record. Petrie, 412 F. App'x at 405; Monguer v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983); see also Fiozzo v. Barnhart, No. 05-CV-561 (LEK/VEB), 2011 WL 677297, at *8 (N.D.N.Y. Jan. 19, 2011) (citations omitted). Ultimately, the final determination of disability and a claimant's ability to work rests with the Commissioner. Snell v. Apfel, 177F.3d 128, 133-34 (2d Cir. 1999); 20 C.F.R. § 404.1527(e) (2005).

Here, the ALJ afforded "good weight" to Dr. Dulkin's "specific functional restrictions, as they appear to account for the claimant's combination of physical impairments and find some support in the longitudinal record." Dkt. No. 8-2 at 34. However, the ALJ assigned "little weight" "[t]o the extent Dr. Dulkin's opinion could be interpreted to mean that the claimant is unable to work[.]" Id. The ALJ assigned "little weight" to Dr. Siddiqi's mental impairment questionnaire as

> [t]he opinion is internally contradictory, as Dr. Siddiqi simultaneously opined that the claimant had a GAF of 58,

denoting no more than moderate limitations.  Also his
opinion is not supported by objective mental status findings
and contemporaneous assessments including GAF scores.
Moreover, there is no mention of the claimant's extensive
polysubstance abuse, which indicates the opinion was based
on incomplete or inaccurate information.

Dkt. No. 8-2 at 35. Although not setting forth a specific weight given to the opinions of

Kimberly Centore, LCSW, the ALJ indicated that he had reasons to "discount" her

opinion because, together with the treatment notes of Dr. Siddiqi, there was

documentation of "a fairly wide range of activities that are not indicative of an individual

with such pervasive symptoms and functional limitations."  Id.  The ALJ also assigned

little weight to Dr. Dulkin's opinion that plaintiff has "marked or severe mental limitations

and would miss more than 3 days of work per month."  Id. at 35.  The ALJ found

"notabl[e]" the fact that "it is not apparent from [Dr. Dulkin's] primary care notes that he

was aware of the claimant's drug use.  Moreover, he is not a mental health specialist."

Id.

The ALJ afforded "substantial weight" to consultative psychiatric examiner Dr.

Alexander's findings because it "is well-supported by the mental status exams and is

consistent with the extent of activities in which the claimant engages."  Dkt. No. 8-2 at

36.  The ALJ assigned "some weight" to the findings of physical consultative examiner

Robi Rosenfeld, D.O. and medical consultant Mary McLarnon, M.D., who "adopted an

earlier DSS assessment that found no physical limitations."  Id. at 33.


a.  **Dr. Siddiqi**

Plaintiff contends that the ALJ was required to accord "great weight" to the

findings of her treating psychiatrist, Dr. Minhaj Siddiqi. Dkt. No. 11 at 6. She contends that the ALJ failed to properly consider the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927 in determining the weight to be given to the medical opinions. Id. at 7. Plaintiff also argues that the ALJ erred insofar as he gave less weight to Dr. Siddiqi based on his incorrect belief that plaintiff failed to report her drug use.

The first reason the ALJ gave little weight to Dr. Siddiqi's findings is because his assessment of severe and marked restrictions was inconsistent with his assessed GAF scores indicating only moderate symptoms and largely normal mental status examinations. Dkt. No. 8-2 at 35. Specifically, the ALJ noted that Dr. Siddiqi set forth a GAF of 58 in his mental impairment questionnaire and GAF scores ranging from 52 to 60 in his treatment notes. Id. The ALJ's consideration of this inconsistency is valid, as consistency is a factor the Regulations direct the ALJ to consider in reviewing a determination and because he did not rely "solely" on the basis of an alleged inconsistency between a treating physician's findings and his GAF scores. 20 C.F.R. § 404.1527(c)(4); Ely v. Colvin, 14-CV-6641P, 2016 WL 315980, at *5 (W.D.N.Y. Jan. 27, 2016) (holding that the ALJ erred in relying solely on an apparent inconsistency between GAF scores and treatment notes in discounting physician's opinion as a GAF score does not amount to "good reasons" to discount a treating physician's opinion); see also Alsheikmohammed v. Colvin, 14-CV-461 (GTS), 2015 WL 4041736, at *8 (N.D.N.Y. 2015) (same). Here, the ALJ did not discount Dr. Siddiqi's opinion solely due to his GAF scores. In addition to pointing out GAF scores suggesting only "moderate" limitations, the ALJ also relied on plaintiff's "fairly wide range of activities that are not

indicative of an individual with such pervasive symptoms and functional limitations" and the fact that "there is no mention of the claimant's extensive polysubstance abuse." Dkt. No. 8-2 at 35. The undersigned will address the latter two factors shortly.

Plaintiff contends that "[w]hile the predominant mental health status evaluations indicated that the Plaintiff, at the time of seeing Dr. Siddiqi, was not experiencing either manic symptoms or depressive symptoms, such had been noted by her treating therapist, whom [plaintiff] was seeing more frequently, and whose records were readily available to Dr. Siddiqi." Dkt. No. 11 at 7. Plaintiff also states that it is "inappropriate to overly emphasize the mental status evaluations in evaluating Dr[.] Siddiqi's opinions, since Doctor Siddiqi is a specialist in thpsychiatric [sic] conditions and had evaluated and treated the Plaintiff for a year and a half, in combination with more frequent therapist evaluations and information in therapy notes." Id. at 7. She contends that the ALJ "minimizes [Dr. Siddiqi's] opinions, referencing extraneous findings; and . . . speculates that there are no disabling symptoms or condition, since the medical practitioner's notes don't state that the condition is disabling." Id. at 7-8.

The undersigned addresses first plaintiff's claims that greater weight should have been given to Dr. Siddiqi's findings because (1) Ms. Centore's treatment notes support plaintiff's symptoms, (2) plaintiff treated with Ms. Centore more frequently than Dr. Siddiqi, and (3) Ms. Centore's records were "readily available to Dr. Siddiqi," Dkt. No. 11 at 7. In making this argument, it appears that plaintiff is contending that the ALJ should have given greater weight to Dr. Siddiqi because he is a specialist, has been treating plaintiff over a longer period of time, and because his opinion is supplemented by notes

40

from plaintiff's therapist, Ms. Centore.  Dr. Siddiqi did reference plaintiff's treatment notes with Ms. Centore, noting plaintiff's reported activities and statements made to her providers.  Dkt. No. 8-2 at 35. Although the ALJ did not discuss Ms. Centore's records in detail, the ALJ noted that her records, together with Dr. Siddiqi's do not support great limitations as their notes document that plaintiff was engaging in wide-range of activities that are not indicative of an individual with such pervasive symptoms and functional limitations.  Dkt. No. 8-2 at 35.

Plaintiff's argument that the ALJ overemphasized the mental status exams and should have given greater weight to the consideration that Dr. Siddiqi is a specialist –  a psychiatrist – and has treated plaintiff for a year and a half does not require a different finding.  Dkt. No. 11 at 7.  First, it is apparent that the ALJ considered the fact that Dr. Siddiqi is a psychiatrist, as he referred to the doctor's records as "psychiatric notes." Dkt. No. 8-2.  Specialization is one of many factors an ALJ can consider in determining the weight to be given to medical opinion evidence. 20 C.F.R. 404.1527(c)(5). However, specialization alone does not entitle an opinion to greater weight if the ALJ finds it otherwise unsupported.  Although the ALJ did not explicitly mention the year and a half period of treatment with Dr. Siddiqi, his decision does reference all treatment notes, suggesting he was aware of the length of the treatment relationship.  Dkt. No. 8-2 at 35 (citing Exh. 13F, 25F).

Plaintiff does not provide citation to the specific records that she appears to contend supports Dr. Siddiqi's RFC or the specific instances wherein the ALJ apparently minimized Dr. Siddiqi's opinions.  However, substantial evidence does

support that Dr. Siddiqi's examinations resulted in largely normal mental status examinations and that some of his opinions suffer from "internal inconsistency." Dkt. No. 8-2 at 35. For example, Dr. Siddiqi completed a mental status examination on February 1, 2012. Dkt. No. 8-9 at 134. At this exam, plaintiff had adequate insight and judgment, neat dress and adequate grooming; normal, productive, and relevant speech, not tangential or circumstantial, no evidence of flight of ideas; oriented times three; affect constricted but congruent to plaintiff's description of her mood and ideation; not expressing paranoid thoughts, delusions, obsessive thoughts; denied suffering perceptual disturbances; denied hopelessness and suicidal/homicidal ideation. Id. Dr. Siddiqi indicated that plaintiff suffered marked limitations in her activities of daily living, but also assessed a "fair" prognosis, concluded that plaintiff had no limitations in maintaining her personal hygiene, and had a satisfactory ability to use public transportation, follow simple instructions, and maintain a regular routine. Id. at 116, 118.

Although the undersigned finds that the ALJ properly considered plaintiff's various activities and weighed those against the opined GAF and Dr. Siddiqi's limited RFC, the undersigned finds otherwise regarding the ALJ's conclusions regarding plaintiff's reporting of her polysubstance abuse to Dr. Siddiqi. The ALJ opines that, because there is no mention of plaintiff's polysubstance abuse in Dr. Siddiqi's mental impairment questionnaire, authored on January 9, 2013, his opinion "was based on incomplete or inaccurate information." Id. at 35. A close review of Dr. Siddiqi's treatment records demonstrates that Dr. Siddiqi was aware of plaintiff's marijuana

significant abuse.  At plaintiff's intake at the Madison County Mental Heath Department – Dr. Siddiqi's medical practice – on July 19, 2011, plaintiff reported that she was "abusing marijuana and will participate in an Adapt evaluation and recommended treatment."  Dkt. No. 8-8 at 240.  The intake form diagnosed cannabis dependence, among other conditions.  Dkt. No. 8-8 at 241.  Dr. Siddiqi signed the intake form on August 10, 2011.  Id.  Further, a treatment note signed by Dr. Siddiqi on October 12, 2011 diagnoses plaintiff with Cannabis dependence.  Id. at 254.  In a treatment note dated December 13, 2011 and signed by Dr. Siddiqi, he noted plaintiff's report that she "smokes marijuana three to four times per day and drinks alcohol occasionally[.]"  Id. at 250.  The undersigned does acknowledge that plaintiff reported cocaine use to Dr. Mohiuddin in 2008 and as early as 2010, Dkt. No. 8-9 at 43, 48, the ALJ's determination suggests a complete failure to inform her provider of her drug habits.  Further, plaintiff did not begin treating with Dr. Siddiqi until 2011, and there is no evidence in the record that plaintiff used cocaine after 2010.  Dkt. No. 8-8 at 48, 235-241.

Thus, although Dr. Siddiqi's mental impairment questionnaire may not have discussed plaintiff's marijuana use, his treatment notes reflect clear knowledge of heavy cannabis use, conflicting with the ALJ's suggestion that Dr. Siddiqi was unaware of any such condition.  Dkt. No. 8-2 at 35.[13]  The ALJ found that the apparent lack of knowledge about plaintiff's drug abuse "indicates the opinion is based on incomplete or

---

[13]  The undersigned is aware that the record contains evidence that plaintiff engaged in a variety of illegal substance abuse beginning at age fifteen; however, the medical records appear to reflect that plaintiff's only current use of illegal substances is marijuana.  There is at least one indication that plaintiff used cocaine in 2008 (two years prior to the June 2010 intake) and in 2010 (four months prior to June 3, 2010, Dkt. No. 8-7 at 43, 48).  Plaintiff's last reported use of amphetamines was when she was eighteen. Dkt. No. 8-7 at 43.

inaccurate information." Id. Although plaintiff's failure to fully explain her complete drug use or full drug history to Dr. Siddiqi is an important consideration, and one that may be relied on in assessing credibility, the ALJ's apparent misunderstanding regarding plaintiff's reporting of her heavy cannabis use to Dr. Siddiqi may have impacted his consideration of Dr. Siddiqi's opinion. Accordingly, as the ALJ seems to have lessened the weight afforded to Dr. Siddiqi's opinion based on his misunderstanding of Dr. Siddiqi's complete lack of knowledge of plaintiff's drug use, it cannot be said that the ALJ's assessment of Dr. Siddiqi's opinions is based on substantial evidence.

### b. Dr. Dulkin

The ALJ afforded good weight to Dr. Dulkin's findings of physical functional limitations, but "little weight" to the extent his opinion could be interpreted to mean plaintiff is unable to work. The ALJ afforded little weight to Dr. Dulkin's opinions that plaintiff has severe and marked mental limitations "for many of the same reasons listed above [in the discussion of Dr. Siddiqi's opinion]." Dkt. No. 8-2 at 35. The ALJ stated that "[n]otably, it is not apparent from [Dr. Dulkin's] primary care notes that he was are of the claimant's drug use. Moreover, he is not a mental health specialist." Id.

The ALJ afforded "good weight" to Dr Dulkin's "specific functional restrictions" that plaintiff could sit up to four hours, thirty minutes at a time, and stand/walk up to four hours, for fifteen minutes at a time; lift ten pounds frequently, and up to twenty pounds occasionally, and needs a sit/stand at will option. Dkt. No. 8-2 at 34. However, it

appears that the ALJ may have misinterpreted Dr. Dulkin's findings as to plaintiff's ability to sit/stand/walk. The ALJ's use of the word "and" indicates that he read Dr. Dulkin's MSS as suggesting that plaintiff could sit for up to four hours in an eight-hour work day *and* walk/stand for a total of up to four hours, totaling *eight* hours of sitting, standing, and walking in an eight-hour work day. Id. However, the undersigned's plain reading of the MSS suggests otherwise. In the MSS, Dr. Dulkin is asked to "indicate how long your patient can sit and stand/walk *total in an eight hour workday* (with normal breaks)." Dkt. No. 8-9 at 110. The question indicates to the undersigned that, in checking off these boxes, the medical provider is reporting the patient's maximum *combined* abilities to sit, stand, and walk. Id. Dr. Dulkin indicates, by checking off boxes, that plaintiff could sit and stand/walk for "[a]bout 4 hours." Id. As the undersigned reads this MSS, Dr. Dulkin's response provided that plaintiff could sit and stand/walk for a combined total of four hours in an eight-hour work day, not, as the ALJ interpreted, four of sitting and four hours of standing/walking. See generally Anthony v. Colvin, 14-CV-848 (DNH/CFH), 2015 WL 5772980, at *22 (N.D.N.Y. Sept. 30, 2015). For an individual to be able to complete light work, such individual must be able to stand and/or walk for six hours in an eight-hour work day and sit for at least two hours or "'sitting most of the time with some pushing and pulling of arm and leg controls.'" Hayes v. Colvin, 13-CV-1566 (MAD/TWB), 2015 WL 1033058, at *9 (N.D.N.Y. Mar. 9, 2015) (citing S.S.R. 83-10 and quoting 20 C.F.R. § 404.1567(b)).

However, even if the ALJ interpreted this question in the same manner as the undersigned, it is unclear upon what medical evidence he based his finding that plaintiff

could perform light work.  If the ALJ understood Dr. Dulkin's RFC to mean that plaintiff

could only sit/stand/walk for four hours combined, then plaintiff would not have the

ability to perform light work.  Hayes, 2015 WL 1033058.  Thus, the ALJ would have had

to rely on different medical evidence in concluding that she could perform light work.

However, the only other physical RFC[14] is from consultative examiner Dr. Rosenfeld,

who opined that plaintiff had no physical restrictions.[15]  Yet the ALJ stated that he

afforded Dr. Rosenfeld's opinion only "some weight" due to "few objective clinical

findings in many of the notes and evaluations. Dkt. No. 8-2 at 33.  Similarly, he

afforded "some weight" to Dr. McLarnon, who did not examine plaintiff and provided a

"case analysis" dated April 26, 2012 which merely "affirmed" a "prior determination."

Dkt. No. 8-9 at 35.[16]  Thus, even assuming the ALJ did not misinterpret Dr. Dulkin's

RFC, his determination that plaintiff could perform light work is not based on substantial

evidence because the ALJ fails to provide the basis for his support.  In White v.

Secretary of Health and Human Servs., 910 F.2d 64, 66 (2d Cir. 1990), the Second

---

[14]  The undersigned observes that the record includes a Physical Residual Functional Capacity
assessment provided by A. Socha on February 8, 2012.  Dkt. No. 8-3 at 2-7.  However, the ALJ makes no
reference to this assessment.  Further, the medical expertise, if any, of A. Socha is unclear.  Id. at 7.

[15]  Further, other doctors who treated plaintiff's physical ailments did not perform functional
capacity analysis.  As the ALJ points out, Dr. Morell, the rheumatologist, provided that plaintiff's ability to
work was unknown without a functional capacity evaluation, of which he was not asked to provide.  Dkt.
No. 8-2 at 33.

[16]  It is unclear which "prior determination" Dr. McLarnon is affirming; however it may be that the
prior determination is a "case analysis" dated April 24, 2012 – two days earlier than Dr. McLarnon's case
analysis – authored by John V. Coughlin.  Dkt. 8-9 at 34.  This "case analysis" does not provide whether
Mr. Coughlin has any medical qualifications.  Id.  It is also possible that Dr. McLarnon's "case analysis"
refers to the February 8, 2012 residual functional capacity assessment of A. Socha.  However, this report
also does not explain A. Socha's medical qualifications, and the ALJ makes no reference to A. Socha's
report.  Dkt. No. 8-3 at 2.  The record also contains a psychiatric assessment from H. Tzetzo.  Dkt. No. 8-
9 at 5.  The ALJ does not cite to this report.

Circuit found that an RFC that a claimant could perform light work was not supported by substantial evidence where the only medical records reaching a finding as to the claimant's residual functional capacity concluded that the claimant could "sit for up to only four hours in an eight-hour work day, and for only two to three hours without interruption" and failed to state any findings on the claimant's ability to handle, push, or pull. The White Court further provided

> Given that sitting, handling, pushing and pulling are included in the list of activities which a person deemed capable of light work should be able to perform, [the Second Circuit thought] the district court erred in finding that [the doctor's] report supported the Secretary's determination. Because [there was] no statement from the Secretary or in the ALJ's decision stating any other basis upon which the determination of [the claimant's] residual functional capacity was made, [the Second Circuit] conclude[d] that the Secretary failed to meet its burden of proving other jobs in the national economy which the claimant is capable of performing.

Id. at 66. Thus, remand is recommended so that the ALJ may perform an assessment of plaintiff's total ability to sit, stand, and walk in an eight-hour work day with the proper understanding of Dr. Dulkin's assessment limiting plaintiff to a combined four hours of sitting, standing, and walking.

Similar to his statement regarding Dr. Siqqiqi's findings, the ALJ stated "it is not apparent from [Dr. Dulkin's] primary care notes that he was aware of the claimant's drug use." Dkt. No. 8-2 at 35. Although discussion of plaintiff's drug use is largely absent from Dr. Dulkin's treatment notes, it appears that the doctor had at least some knowledge of her drug use. In Dr. Dulkin's treatment note dated February 27, 2006, plaintiff reported that she smoked marijuana "occasionally to relieve headache," and Dr.

47

Dulkin indicated that he "counseled [plaintiff] for drug use such as marijuana and I have encouraged her to stop this stuff." Dkt. No. 8-9 at 56-57. Further, there is evidence in the record that plaintiff was using cocaine during some of the time she treated with Dr. Dulkin, Dkt. No. 8-7 at 43, 48. Thus, the ALJ could properly consider the fact that plaintiff failed to report the full extent of her marijuana use – which she reported to other providers was on a daily basis – or her apparent cocaine use. Dkt. No. 8-2 at 35. However, the ALJ appeared unaware that Dr. Dulkin had at least some knowledge of plaintiff's marijuana use.

Although it is unclear the extent to which the ALJ afforded Dr. Dulkin's opinion less weight due to this finding, as the matter must be remanded for a reconsideration of plaintiff's physical residual capacity, to the extent that the ALJ wishes to address whether and to what extent Dr. Dulkin was aware of plaintiff's drug abuse, it is recommended that the ALJ consider the February 27, 2006 treatment note indicating some knowledge of plaintiff's marijuana use. Dkt. No. 8-9 at 56-57.

### c. **Ms. Centore**

Plaintiff contends that the ALJ "erroneously disregards" Ms. Centore's "concurring opinions and the foundation on which they were expressed." Dkt. No. 11 at 10. "While opinions from social workers are not considered 'acceptable medical sources,' such opinions are nevertheless 'important and should be evaluated on key issues such as impairment severity and functional effects.'" Alsheikhmohammed, 2015 WL 4041736, at *6 (quoting 20 C.F.R. § 416.913). Although the ALJ is "free to decide

48

that the opinions of 'other sources' . . . are entitled to no weight or little weight, those decisions should be explained." Oaks v. Colvin, 13-CV-917 (JTC), 2014 WL 5782486, *8 (W.D.N.Y. Nov. 6, 2014) (emphasis added) (citation omitted).  SSR 06-03p states that when evaluating the opinions of "medical sources who are not 'acceptable medical sources,'" the factors the ALJ should consider include:

> [h]ow long the source has known and how frequently the source has seen the individual;
>
> [h]ow consistent the opinion is with other evidence; degree to which the source presents relevant evidence to support an opinion;
>
> [t]he degree to which the source presents relevant evidence to support an opinion;
>
> [h]ow well the source explains the opinion;
>
> [w]hether the source has a specialty or area of expertise related to the individual's impairment(s);
>
> and [a]ny other factors that tend to support or refute the opinion.

SSR 06-03p, 2006 WL 2329929, at *4-5.  SSR 6-03p further provides

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

Id. at *6.

The undersigned disagrees with plaintiff's characterization insofar as she

suggests that the ALJ entirely disregarded Ms. Centore's treatment notes or statement. Although the ALJ failed to state the specific weight he afforded to Ms. Centore's opinions, he indicated that a "reason to discount" her assessment was the fact that her treatment notes, together with Dr. Siddiqi support "a fairly wide range of activities that are not indicative of an individual with such pervasive symptoms and functional limitations." Dkt. No. 8-2 at 35. Despite the ALJ's use of the term "discount," he discussed some of Ms. Centore's treatment notes which reflecting plaintiff's self-reporting of her side effects, impulsive behavior, and suicidal ideations. Dkt. No. 8-2 at 25 (citing Exh. 26F). Although Ms. Centore's January 2013 statement indicates that plaintiff suffered from "depression . . . poor concentration, appetite disturbance, indecision, loss of interest and feelings of helpless ness and hopelessness" along with social anxiety, Ms. Centore did not provide a functional assessment of plaintiff's ability to perform basic work activities. Dkt. No. 8-6 at 146. Further, Ms. Centore's treatment notes lack mental status examinations. See Dkt. No. 8-8 at 242-48, 252, 260-628. Thus, rather than ignore Ms. Centore's records and statement, the ALJ afforded, what appears to be, very little weight, and provided his reasoning.

Although the ALJ perhaps would have been better advised to explicitly state the weight he afforded to Ms. Centore's January 2013 report or treatment notes, it cannot be said that he did not adequately comply with the requirements of SSR 06-03p as he did evaluate her statement and treatment notes and stated his reasoning, at least in part for "discount[ing]" Ms. Centore's assessment. Dkt. No. 8-2 at 35. Thus, it is readily inferable that the ALJ gave little, if any weight, to Ms. Centore's notes and statement.

See generally Bostwick v. Colvin, 14-CV-374S, 2015 WL 5036976, at *4 (W.D.N.Y. Aug. 25, 2015) (noting that, although the ALJ did not explicitly state the weight he afforded to a non-medical source's opinion, where the reader could infer the weight afforded to the source's opinion from the ALJ's discussion of such opinion, the ALJ did not commit error). It is within the ALJ's discretion to evaluate Ms. Centore's treatment notes and statement and determine the weight to afford it based on the evidence in the record. Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995). Accordingly, the ALJ's failure to provide a specific assignment of weight to Ms. Centore's treatment notes and brief statement is not reversible error.

### d. Providers' Failures to Reach Disability Findings

Plaintiff argues that the ALJ committed reversible error insofar as he faulted or afforded less weight to the opinions of certain treating providers because they did not reach a conclusion as to whether plaintiff was disabled from her conditions. Plaintiff does not specify the specific instances with which she takes issue, but a close reading of the ALJ's determination suggests that plaintiff is referring to the opinions of Dr. Mohiddin, Dr. Pedersen, and Dr. Morrell. The ALJ observed that Dr. Mohiddin and Dr. Pedersen failed to conclude that plaintiff was disabled by her mental health symptoms or back pain, respectively, and that Dr. Morrell failed to set forth whether plaintiff was able to work. Dkt. No. 80-2 at 33-34. Plaintiff opines that even if the doctors had provided such conclusion, it would not have been entitled to significant weight, as a conclusion as to disability is reserved to the Commissioner. Dkt. No. 11 at 8. Plaintiff

correctly notes that a finding as to disability is reserved to the Commissioner, 20 C.F.R. § 404.1527 (d)(3), but the undersigned is unconvinced that the ALJ used the "lack of disability opinions in treatment notes, to discredit later quantitative responses concerning a claimant's functional abilities." Id. The undersigned is unsure, in  why bringing attention to the fact that Dr. Pedersen and Dr. Mohiddin did not indicate whether plaintiff was disabled from her conditions, and that Dr. Morrell declined to reach a conclusion of plaintiff's ability to work absent a functional capacity evaluation, whether the ALJ afforded less weight to their opinions of limitations.  It appears that the ALJ cited to the lack of such conclusions as an attempt to draw an inference that plaintiff's symptoms and conditions could not be significant, as the doctors did not opine that she was disabled.  Although the undersigned does not agree that a provider's failure to reach a finding as to disability at all suggests that the condition may not be serious or severe and notes that reliance on a lack of such findings may be improper, despite pointing out these lack of findings, it does not appear that the ALJ afforded lesser weight to these opinions because of the lack of disability findings.

However, as it is possible that the ALJ may have lessened the weight given to the doctors' suggestions of functional limitations due to their lack of finding as to whether plaintiff's conditions were disabling, it is recommended that, on remand, to the extent the ALJ wishes to address the lack of disability findings made by medical providers, he must either re-contact such medical providers for such a determination or clearly explain the reason for citing the lack of disability finding and whether and how that finding impacted his assessment of such opinions.

### (3) **Failure to Consider Pyelonephritis, Overactive Bladder, Frequent UTI, Personality Disorder, Impulse Control Disorder, Right Knee Pain, Migraine, Back pain**

### i. Right Knee Pain

Plaintiff contends that the ALJ failed to consider the limitations caused by her right knee pain; however, substantial evidence supports his otherwise. The ALJ reasonably noted that imaging studies were negative. Dkt. No. 8-2 at 33. Indeed, a right knee MRI showed the following:

> mild increased signal intensity seen in the proximal tibia posterioly, probably secondary to heterogeneous marrow replacement. The medial and lateral collateral ligaments, quadricepts and patellar tendon along with ACL and PCL are within normal limits. There is no signal abnormality in the menisci. A 6mm Baker's cyst is identified. There is no significant joint effusion. Articular cartilage of the patella is preserved. The joint spaces are unremarkable. Impression: subcentimeter Baker's cyst. Otherwise, no acute findings.

Dkt. No. 8-9 at 99. Thus, although plaintiff indicated that she experienced right knee pain, other objective medical evidence does not support significant limitations. The ALJ set forth accommodations in her RFC insofar as limiting her to light work with only occasional climbing of ramps/stairs, balancing, kneeling, and stooping and providing that plaintiff can never crawl, crouch, climb ladders, ropes, or scaffold, and needed a sit/stand at will option. Dkt. No. 8-2 at 31. Dr. Dulkin provided that plaintiff could occasionally climb, balance, and bend and twist at the waist; and could frequently kneel, crouch, crawl, and stoop. Dkt. No. 8-9 at 112. Dr. Dulkin provided that plaintiff could occasionally climb, balance, and bend and twist at the waist; and could frequently kneel, crouch, crawl, and stoop. Dkt. No. 8-9 at 112. At her examination with consultative

examiner Dr. Rosenfeld, plaintiff appeared to be in no acute distress, had normal gait, could walk on heels and toes without difficulty, had a normal stance, and could perform a full squat. Dkt. No. 80-8 at 273. Accordingly, the undersigned concludes that the ALJ appropriately considered plaintiff's complaint of knee pain.

However, due to the undersigned's findings regarding the ALJ's apparent misunderstanding of Dr. Dulkin's opined limitations on plaintiff's ability to sit/stand/walk, it is recommended that, on remand, the ALJ consider any impact plaintiff's knee pain may have on her ability to sit/stand/walk.


### ii. Low Back Pain

Referring to her low back pain, plaintiff contends that the ALJ "erroneously minimizes such findings [MRI taken of back], referring to the fact that x-rays done in January 2012 were negative. It is known that x-rays demonstrate bony disease and are not useful for disc disease (soft tissue)." Dkt. No. 11 at 19. Plaintiff offers no medical support or citation for this claim, and it is not the Court's role to assess the "purpose" of imaging studies. Regardless, the ALJ did not rely on the negative x-rays alone. He referred to the July MRI findings, and Dr. Pederson's reading of the MRI. Dkt. No. 8-2 at 33. Further, the record supports consideration of normal spinal x-rays: Dr. Morell noted that x-rays of plaintiff's lumbar spine showed mild degenerative disc disease and all other testing and x-rays were within normal range. Dkt. No. 8-9 at 181. Thus, the ALJ did not "erroneously minimize findings" relating to plaintiff's low back pain.

Again, as the undersigned recommends reconsideration of plaintiff's RFC in part

due to the ALJ's misinterpretation of Dr. Dulkin's findings regarding plaintiff's abilities to sit, stand, and walk, it is recommended that, on remand, the ALJ consider any impact plaintiff's low back pain may have on her ability to sit/stand/walk.

### iii. Impulse Control Disorder and Personality Disorder

In arguing that the ALJ failed to properly consider her impulse control disorder and personality disorder, plaintiff refers to portions of the record she contends demonstrates the ALJ "erroneously minimiz[ing her] psychiatric conditions[.]"  Dkt. No. 11 at 15.  Plaintiff argues that "the ALJ erroneously failed to explain circumstances consistent with limitations," including taking a knife to her risk; hearing voices; contemplating harming her children; a GAF score of twenty while hospitalized, a GAF discharge of 55, which "did not constitute complete recovery"; and that "psychiatric practitioners credited her reports of anxiety and depression, suicidal ideation, feelings of worthlessness and fear, by prescribing medications commonly prescribed to treat those symptoms."  Dkt. No. 11 at 15-16.

Insofar as plaintiff contends that the ALJ failed to adequately consider her impulse control disorder, plaintiff provides no specific citations to the medical records that she contends supports a greater functional limitation due to such disorder.  As noted, an ALJ is not required to mention each and every record in performing his or her assessment.  Although the ALJ did not explicitly mention the fact that plaintiff held a knife to her wrist, contemplated harming her children, and, at some point, heard voices, in referencing Ms. Centore's and Dr. Mohiuddin's medical treatment notes, the ALJ

acknowledged records of plaintiff's past suicidal ideation and suicide attempt and referenced well as referenced hospital records from her two psychiatric admissions. Dkt. No. 8-2 at 34-35. Further, the ALJ acknowledged plaintiff's frequent reports to her medical providers of suicidal ideation, hopelessness and helplessness, poor concentration, appetite disturbance, loss of interest. Id. The ALJ also referenced St. Joseph's Hospital note that, while hospitalized, plaintiff's frequent socialization with peers indicated, according to medical providers, "an affect incongruent with her complaints of depression." Id. at 34. Balanced against those reports, the ALJ identified records from plaintiff's treatment providers and a consultative examiner indicating appropriate grooming, cooperative nature, good eye contact, normal speech, lack of delusions, lack of suicidal or homicidal ideation, intact cognition, adequate or fair insight, fair judgment, and good impulse control. Id. at 34-35. Although there records indicating that plaintiff experienced periods of hopelessness, suicidal and homicidal ideation, loss of appetite, apparent inability to care for her children, the ALJ referenced treatment records indicating that plaintiff's condition improved following her release from hospitalization and GAF scores indicating moderate symptoms, excepting during a period of hospitalization. Dkt. No. 8-2 at 34-35. The undersigned recognizes that some of the evidence may be susceptible to more than one rational interpretation. The question for the reviewing court, however, is not whether there was evidence supporting plaintiff's view; rather, it asks whether there is substantial evidence the support the ALJ's finding of residual functional capacity. See, e.g., Miley v. Colvin, 13-CV-566 (GLS/ESH), 2014 WL 4966144, at *8 (N.D.N.Y. Sept. 30, 2014). When the evidence is

examined as a whole, it would allow a reasonable mind to accept the conclusions reached by the ALJ, and thus these findings must be upheld." Comstock v. Astrue, 07-CV-989, 2009 WL 116975, at *12 (N.D.N.Y. Jan. 16, 2009) (citing Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). Accordingly, the undersigned finds that the ALJ appropriately considered the functional affects of plaintiff's mental impairments.

Plaintiff also contends that the ALJ erred in referring to a June 23, 2011 discharge summary following her psychiatric admission at St. Luke's Hospital insofar as he concluded that her psychiatric problems were largely attributable to her substance abuse. Dkt. No. 11 at 16. Samuel Westmoreland, M.D., an attending physician during plaintiff's admission at St. Luke's, indicated that plaintiff's drug abuse was "a primary problem area" and noted that "as long as she is having all of these depression and pain issues that have all developed in the setting of heavy cannabis, that there really is not going to be a lot of psychiatric care available as long as she is stoned much of the time." Dkt. No. 8-7 at 59. The record indicates that plaintiff's various mental health providers, Dr. Mohiuddin, Dr. Siddiqi, Ms. Centore, and her primary care physician, Dr. Dulkin, were aware of at least some of plaintiff's substance abuse issues. Although her doctors expressed concern and recommended that she enter a treatment program, nothing in the record suggests that these doctors believed that her mental condition was caused, or exacerbated by, her drug use. It is unclear, in citing to this record, if the ALJ reached a determination as to the cause of plaintiff's mental impairments. Although "improvement when not using drugs could constitute substantial evidence to support a determination that a plaintiff would not be disabled were he or she to discontinue

57

alcohol and/or drug abuse" Olmstead v. Commissioner of Soc. Sec., 12-CV-1225, 2015 WL 9581833, at *4 (N.D.N.Y, Dec. 20, 2015) (citing Cage v. Comm'r, 692 F.3d 118, 127 (2d Cir. 2012)), the record lacks any evidence that plaintiff's mental condition improved while abstaining from drug use.  Further, Dr. Alexander, whom the ALJ afforded substantial weight, concluded that plaintiff's polysubstance abuse did "'not significantly interfere with the claimant's ability to function on a daily basis.'"  Dkt. No. 8-2 at 36.

The Regulations provide that an individual is not to be considered disabled if a drug addiction would be a contributing factor material to the determination whether the individual is disabled; however, if the individual "would be disabled regardless of the drug or alcohol use, then it is not a contributing factor."  20 C.F.R. § 404.1535(A)(1). It is clear that it is plaintiff's burden to demonstrate that her substance abuse is not a contributing factor to her disability determination. Cage, 692 F.3d at 127 (citing Doughty v. Apfel, 245 F.3d 1274, 1281 (11th Cir. 2001).   Ultimately, it is not clear from the determination whether the ALJ considered plaintiff's drug abuse as a "contributing factor" to her mental illness.  As the undersigned is unable to discern from the determination whether the ALJ, in citing to Dr. Westmoreland's treatment notes, determined that plaintiff's drug use was a contributing factor to her mental impairments, on remand, it is recommended that, should the ALJ wish to rely on Dr. Westmoreland's comments regarding plaintiff's drug use and its impact on her psychiatric treatment or progress, the ALJ must clearly state any conclusions he drawing from those records regarding the impact of plaintiff's drug use on her impairments and any record support that exists to support such conclusion.

### iv. Migraines

Plaintiff argues that the ALJ failed to consider the "functional effects" her migraines, such as the frequency of her migraines and the extensive history of treatment she obtained for migraines.  Dkt. No. 11 at 16.

The ALJ considered plaintiff's statements that she reported experiencing twenty headaches per month, was prescribed Botox, and reported that medications did not work, although "earlier notes had documented good control with Amerge."  Dkt. No. 8-2 at 32.  The ALJ also noted that plaintiff was "in no acute distress" during her physical consultative examination, and her musculoskeletal and neurological findings were normal.  Id. at 32-33.

The ALJ appears to give lesser weight to plaintiff's claims of debilitating migraines because, during plaintiff's physical exams, she "was in no acute distress." Dkt. No. 8-2 at 33.  However, plaintiff points out that it would not be possible to have objective findings for her migraines as she did not go to exams while she had an active headache.  Dkt. No. 11. at 17.  Further, the ALJ noted that her musculoskeletal and neurological exams were normal, with a normal CT scan.  Dkt. No. 8-8 at 232. However, it is an error for an ALJ to fault plaintiff for lack of such clinical findings with relation to migraines "'[b]ecause there is no test for migraine headaches, when presented with documented allegations of symptoms which are entirely consistent with the symptomatology for evaluating [the claimed disorder], the Secretary cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence.'"  Sech v. Comm'r of Soc. Sec., No. 7:13-CV-1356 (GLS), 2015 WL 1447125,

at *3 (N.D.N.Y. Mar. 30, 2015) (quoting <u>Federman v. Chater</u>, No. 95 Civ. 2892, 1996 WL 107291, at *2 (S.D.N.Y. Mar.11, 1996) and <u>Groff v. Comm'r of Soc. Sec.</u>, No. 7:05-CV-54, 2008 WL 4104689, at *6-8 (N.D.N.Y. Sept. 3, 2008) ("[T]o place such emphasis on the absence of "any specific evaluation or treatment" is not only a misstatement of the medical evidence, but is also a misreckoning of the elusive task a doctor faces in diagnosing this impairment as there exists no objective clinical test which can corroborate the existence of migraines.").

Further, the ALJ contends that plaintiff stated that her medications were not working, which the ALJ implies contradicts "earlier" treatment notes documenting "good control with Amerge." Dkt. No. 8-2 at 32. It appears that the ALJ was referring to a December 22, 2010 and November 6, 2011 treatment notes indicating that Amerge "does help" and "is still working." Dkt. No. 8-8 at 210-11. However, other medical records demonstrate that, although Amerge was helpful in reducing the severity of her headaches, plaintiff was still having some headaches that were resistant to the medication. Dkt No. 8-8 at 234. Further, plaintiff testified that she was only approved for twelve pills per month, so she had to "spread them out over the month." Dkt. No. 8-2 at 67-68. Plaintiff testified that she would take Amerge every day if she could, but she does not have enough pills. <u>Id.</u> She further testified that Sumavel helped reduce her pain to a three or four out of ten, and worked within ten minutes, but plaintiff did not like to take the Sumavel because it hurt. <u>Id.</u> at 68-69. Plaintiff takes Sumavel approximately twice a month because "it hurts really bad to do it." <u>Id.</u> at 69. Similarly, although the Botox made her headaches " a little bit better, she still wakes up with pain

every day and the shots hurt.  Id. at 66.  Thus, plaintiff reported *some* relied with

migraine medications, but stopped short of stating that medication provided full relief or

that she had sufficient access to medication to allow her to maintain pain relief.  The

ALJ did not address the fact that, although medications appear to reduce plaintiff's pain

from migraines, they do not appear to eliminate her migraines.

Accordingly, on remand, the ALJ is to reconsider plaintiff's migraine

symptomology while recognizing plaintiff's specific statements about her medication's

effectiveness and without reliance of the lack of objective or clinical findings for her

migraines.

### v. **Pyleonephritis, Overactive Bladder, Frequent UTI**

Plaintiff argues that the ALJ erroneously stated that the Plaintiff's "polynephritis

[sic], frequent urinary tract infections and overactive bladder are transient, controlled by

medication and are shown not to cause significant functional limitations."  Dkt. No. 11 at

11.  Plaintiff presents her testimony about needing to use the rest room "up to twenty-

two times per day, frequently only being able to perform activities for about twenty

minutes, before having to return to the restroom."  Id.

Substantial evidence supports the ALJ's determination that plaintiff's overactive

bladder and UTI did not cause significant limitations.  Dkt. No. 8-2 at 32.  Dr. Bashar

Omarbasha, a urologist who diagnosed plaintiff with overactive bladder, reported that

plaintiff was doing "extremely well except for recurrent UTI, which is occurring mostly

after sexual intercourse."  Dkt. No. 8-7 at 180-81.  Dr. Ombarbasha observed that

Enablex "is working extremely well as far as overactive bladder is concerned." Id. at

181. To manage her UTI infections, Dr. Omarbasha provided her with "a prescription

for Macrobid to be taken before and the day after intercourse." Id. At a follow up visit,

plaintiff was doing "extremely well on the Macrobid and on the Enablex." Id. at 182. At

another visit, plaintiff "ran out of Enablex; therefore, she has a recurrent frequency and

urgency and occasional urge incontinence. Today she is asking us to place her back

on the Enablex." Id. Although plaintiff testified at her hearing that she has urgency

issues, urinating up to twenty-two times in one day, the only medical evidence in the

record supports a finding that plaintiff's urgency issues were well-controlled when she

actively took her medication. Id. "Where the Commissioner's decision rests on

adequate findings supported by evidence having rational probative force, [the Court] will

not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d

578, 586 (2d Cir. 2002)). Here, substantial evidence supports the ALJ's determination

that these issues did not cause plaintiff significant limitations that impede her ability to

perform basic work activities.


### 3. Credibility

Plaintiff contends that the ALJ erred insofar as he failed to apply the

requirements of SSR-97p in assessing her credibility. Dkt. No. 11 at 20. Specifically,

plaintiff argues that (1) her reported daily activities are not inconsistent with her claims

of limitation, (2) her desire to undertake part-time work "is also not indicative of the

ability to engage in substantial gainful activity," (3) the ALJ "erroneously reduced the Plaintiff's credibility, because the plaintiff 'did not report income from babysitting'" and cleaning houses, and (4) the ALJ "erroneously references the Plaintiff's alleged failure to make her other medical practitioners aware of her 'extensive daily illegal drug use,' but does not cite any medical evidence that the Plaintiff's drug use caused or aggravated the symptoms that the Plaintiff complained of." Dkt. No. 11 at 19-28.

Having found remand necessary, the undersigned does not reach plaintiff's arguments that the ALJ erroneously assessed her credibility. The credibility arguments primarily address the ALJ's evaluation of the evidence in the record, including her reporting her drug use to her medical providers, which will "necessarily be altered" upon the ALJ's development of the record as directed by this Decision and Order. Crowley v. Colvin, 13-CV-1723 (AJN/RLE), 2014 WL 4631888, *5 (S.D.N.Y. Sept.15, 2014). On remand, it is recommended that the ALJ consider plaintiff's credibility in light of the newly-developed record as a whole.


### III.  Conclusion

WHEREFORE, for the reasons stated above, it is hereby

**RECOMMENDED** that the Commissioner's motion for judgment on the pleadings be **DENIED**, that plaintiff's motion for judgment on the pleadings be **GRANTED**, and that the Commissioner's decision denying disability benefits be **REMANDED**, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Report-Recommendation and Order; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **fourteen (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED**.

Dated: March 4, 2016
    Albany, New York

*Christian F. Hemmel*

Christian F. Hummel
U.S. Magistrate Judge